# 𝔚𝔶𝔱𝔥𝔢𝔳𝔦𝔩𝔩𝔢.

## LAWS v. LAW.

### July 20, 1882.

1. RESULTING TRUST.—It is well settled that when property purchased by A with B's money, is conveyed to A, a court of equity will raise a resulting trust in favor of B, and will decree an execution of the trust by requiring it to be conveyed to B.

2. IDEM—*Case at bar.*—Land whereon H was living was sold to H, but was cried off to his son L; that H, who was solvent, might be received as surety on the bonds for the purchase money. H paid all the money, but being infirm, sent it by L, who procured the deed to be made to himself. He, when informed thereof, reprimanded his son, who admitted the wrong, and promised to convey the land to H, who died before such conveyance was made, but who by will devised the land, first, to pay his debts; secondly, to his two daughters. The devisees being threatened by L with eviction, brought their bill to annul the deed.

HELD:

These circumstances raise a resulting trust in favor of the devisees of H, and L must convey the land to them.

Appeal from decree of circuit court of Franklin county, rendered 15th April, 1878, in suit of Pheriby Law and Jane Law against Leroy B. Law.

The decision of the circuit court being against the complainants, they obtained an appeal from one of the judges of this court. The proceedings and the facts of the case are fully stated in the opinion.

*Griffin & Lowry,* for the appellants.

*George E. Dennis,* for the appellee.

ANDERSON, J., delivered the opinion of the court.

Henry Law, by his last will dated December, 1863, which was admitted to probate by the county court of Franklin, on the first day of February, 1864, bequeathed all his property, real and personal, after payment of all his just debts, to his two daughters, the appellants, to be equally divided between them. It seems he had no real estate, except the small tract of fifty acres situate in the county of Franklin, on which he lived and died. After his death about the year 1864, his said daughters occupied it, claiming the right to it under their father's will—having the continued and exclusive possession of it from the death of their father to the present time—no one even disputing their right or claiming adversely to them, until shortly before they filed their bill against the defendant in this cause, on the 16th day of January, 1876. Leroy B. Law then for the first time set up a claim to the land, and threatened to turn them out of their home by suit, if they did not surrender it to him. He claimed it under a deed from the executors of John Law, deceased, bearing date the 7th of August, 1852, which they allege he fraudulently procured to be executed to himself, instead of to his father, who purchased and paid for the land, through his agency, by a betrayal of the confidence reposed in him by his father. The appellants, Pheriby Law and Jane Law, devisees of their father, Henry Law, then filed their bill in chancery against the said Leroy Law to be relieved against the operation of said deed; which is this suit.

The land was bought at the said executor's sale in December, 1846, and a bond given for the purchase money, $311, payable in twelve months, which was executed by Leroy B. Law and Henry Law. The bill alleges that the land was purchased for the father, and that the son's name

was put first in the bond because, by the terms of the sale, bond with security was required, and the son having no property, would not have been taken as security. It also alleges that the money to pay for the land belonged to the father, and that the son got it from him to pay for the land, and to get him a deed for the same.

The answer of the defendant is contradictory of itself, confused and prevaricating. At one time he denies that Henry Law became the purchaser, and says, "on the other hand, said land was purchased and paid for by this respondent." It might have been knocked down on his bid at the sale, and paid for by him, and yet if he bid for his father, and the latter furnished the money to pay for it, it would have been his land. But he adds, "with his *own* money," that is, respondent's money. If that is true, it looks like it might be his property. But in the next sentence he says, "The purchase was made by this respondent and his father." That implies that they were joint purchasers and joint owners. Again, "He also claims that the said Henry placed money in his hands, belonging to said Henry, to pay for the same." *Belonging to said Henry.* A peculiar or unusual qualification. It implies that he *had* placed the money in his hands to pay for the land, but that it was not his money. It did not belong to him. The allegation of the bill can hardly be said to be denied unequivocally, which is proved positively by two witnesses. It is true they were the complainants; but they are competent witnesses by the law, and there is no exception to their competency; and, as we shall see, their testimony is well supported and corroborated by other evidence in the record, and it outweighs the denial of the answer, even if it had not been equivocal and prevaricating. But in the next sentence he says, "The said Henry paid a large part of the purchase money of said land, but in doing so he was paying a debt he owed this respondent." A large part of

the purchase money was then paid with Henry's money. But he said before, that the land was paid for "by this respondent with his *own* money." The two statements seem to be contradictory. But while Henry was paying it with *his* money, he says he was paying a debt he owed this respondent; and therefore the conclusion is implied that though Henry paid the greater part of the purchase money, he was at the time owing him a debt, and therefore, though he paid the purchase money (and it was paid through him, respondent, for he said before that the land was "paid for by this respondent"), yet, as he was owing him a debt at the time, the money he paid for the land must be regarded as his respondent's money. That this is so, it will more fully appear by a subsequent statement in his answer. He says, "that on the 11th day of June, 1847, the said Henry Law being indebted to this respondent in the sum of $250, for borrowed money, executed to this respondent his bond for that amount, as appears by his bond herewith filed as a part of this answer, marked 'Z'; that this bond has been fully paid off and discharged by the said Henry Law paying the amount of the same on the debt due from respondent for said land. In this way said land was most entirely paid for by said Henry Law, but in doing so he was but paying his indebtedness to this respondent." Then he admits that the land was most entirely paid for by Henry Law. If so, his money must have paid for it. And, as he said before that the land "was paid for by this respondent," it could not have been paid for by Henry Law in person, and he must have placed the money in his hands to pay for it, and it falsifies his previous denial that said Henry "placed money in his hands belonging to said Henry to pay for the same." The fact that he did, is positively proved by the two witnesses before named, and that he sold two little negroes to raise the money, and that he raised a larger amount than was necessary for that purpose, and

that respondent took a larger amount of his father's money than was necessary for that purpose and kept the surplus. And the answer of respondent sustains the testimony of these witnesses, for it is a virtual admission that he got the money from his father, which at least almost entirely paid for the land; which money he assumes was not his father's, but his own, because his father was owing him a debt at the time amounting to the larger portion of it, and exhibits the bond with his answer.

If that bond was a subsisting *bona fide* debt of the father, the applying the money which he got from his father to pay for his land and to get him a deed for it, to the discharge of the debt which he held against him, without the knowledge or consent of his father, which is implied by the answer, and which certainly is not averred to the contrary. And upon that ground claiming the money to be his own, and paying for the land with it as his own money, and taking a deed to himself for the land, was a betrayal of the confidence of the father and was a gross fraud upon him. And this conclusion, I think, may fairly be drawn from the answer itself. Suppose the father owed him a debt, what right had he to take the money which his father gave him to pay for his land, and retain it himself in discharge of his debt, and have the deed executed to himself instead of his father, on the payment of the money which he got from his father, claiming it to be his own because he held a debt against his father, which was equal to the larger part of the money he got from him to pay for the land?

But did he in fact apply the money in discharge of that bond? He never surrendered the bond to his father, but still holds it, and files it as an exhibit in this cause. The bond was not actually discharged. It was still in his possession. No entry or endorsement was made upon it showing that it was paid. And it was as much evidence of his

father's indebtedness to him subsequent to the payment of the purchase money for the land and the execution of the deed as it was before, and this evidence was in his own possession. This fact is strongly confirmatory of the construction I have placed on his answer, and shows that the bond was not discharged, as he alleges, but was as much a liability on his father after the payment of the purchase money, and the execution of the deed to himself, as it ever had been.

But as we have seen, to apply the money which his father had given him to pay for his land, and get him a deed in payment of a debt which his father owed him, and then to pay for the land with his own money, as he says he did, and to take a deed to himself, was a fraud upon his father, if his pretension was true.

But he says it was his land, and not his father's, which his father gave him the money to pay for, which money he converted to himself, by discharging a debt which his father owed him, and then paid it as his own money for *his* land. But this is disproved by his declarations to two witnesses. Polly Smithers testifies that he told her that the land was not his; that Henry Law's money paid for it. Peter Lee Dent, who was a tax-gatherer in Franklin county for eight years, testifies that he presented a tax ticket against him in 1860, "and he said he would not pay it, because the land did not belong to him, but belonged to his daddy, Henry Law." And he said "the land is no more mine than it is yours." He testifies further that he said: "My father got in a tight place and had the land deeded to me to save him a home. He told me that the deed made to him was fraudulent; and if it had not been deeded to me it would have been sold, and he would have had no home at all."

Thus the averments in the answer of the defendant that

the land was purchased for him, and not for his father, and that it was his land and not his father's, is disproved by the testimony of two disinterested witnesses, which corroborates the positive and direct testimony of Pheriby and Jane Law in contradiction of the answer. But the witness Dent proves further declarations of the defendant to the effect that Henry Law had the deed made to him to defraud his creditors.

The doctrine is well settled that a fraudulent conveyance, though void as to creditors, is good between the parties themselves (*Owen* v. *Sharp and als.*, 12 Leigh, 441); so that the declarations of the defendant last mentioned by the witness were declarations in favor of the defendant's interest; because, if true, he would be protected in his iniquity, and claim the land under his deed. But such declarations have not the test of truth that declarations against his interest have, and which are admissible in evidence upon the ground that declarations made against one's interest are probably true. But Greenleaf says the whole admission must be taken together; for though some part of it may contain matter favorable to the party, and the object is only to ascertain that which he has conceded against himself, *for it is to this only* that the reason for admitting his own declarations applies—namely, the great probability that they are true; yet, unless the whole is received and considered, the true meaning and import of the past, which is good evidence against him, cannot be ascertained." So that whilst all his declarations made at the time must be received, only those which are against his interest are good evidence. And the author goes on to say, "But though the whole of what he said at the same time, and relating to the same subject, must be given in evidence, yet it does not follow that all the parts of the statement are to be regarded as equally worthy of credit."

1 Greenlf. Ev. § 201; Taylor on Evidence, vol. 1, p. 615, § 725, is to the same effect.

The part of his declarations which is not against but in favor of his own interest, we do not think is entitled to any weight; not only for the reason that they are not against his interest, but for the following additional reasons—first, they are directly in conflict with the whole theory of his answer to the plaintiff's bill; secondly, the record shows no motive for Henry Law to make such a fraudulent conveyance—there is no evidence that he was indebted to anybody—that he was owing a dollar; and, thirdly, it does show that he felt the obligation, and had the disposition to pay any debts that he may have justly owed; for by his will, he first of all charges whatever estate he left, real and personal, with the payment of his debts.

The acts and declarations of Henry Law are uniformly inconsistent with his son's pretensions in this suit. I attach no importance to the testimony of Marshall Ayres. It stands alone, unsupported by any testimony in the record, but in conflict with much of the evidence I have commented on, and the entire drift and scope of the whole case. It is shown by the whole conduct, acts, and declarations of Henry Law, that he ever claimed, treated, and considered the land his own. He retained the uninterrupted and exclusive and undisputed possession and control of it as his own as long as he lived—a period of seventeen or eighteen years—and then by the most solemn act of his life, in contemplation of his death, devised it to his two daughters.

And the acts and declarations and conduct of the defendant show, that he knew and acknowledged it to be his father's, and that *he* had no right to it. For thirty years he never made any claim to it, but acquiesced without

complaint or suggestion of claim of right in himself, in the exclusive possession by his father of the land and absolute control of it as his property for seventeen or eighteen years, as long as he lived. And after his father's death, knowing that he had made his will and devised the land to his sisters, and that they were holding possession of it as their right of property under the will, from the death of their father in January or February, 1864, until shortly before the institution of this suit—a period of about twelve years—he never once pretended that he had any claim of right to it, or intimated a denial of their right.

And then after he asserted a claim, and threatened to sue them and turn them out of possession, which caused them to institute this suit to quiet their title, and to require him to surrender the instrument which he had falsely and fraudulently procured, on which he rested as a muniment of title in himself, his prevarication, contradiction, and false and conflicting statements in setting out his grounds of defence. And the proof of his destitution of property or means to have enabled him to purchase and pay for the land in question, and appearing from the testimony to have been an idle, trifling and thriftless person, taken in connection with the evidence already commented on, outweighs any evidence or circumstance on which he relies as in his favor, and preponderates in favor of the conclusion that he has no just claim to the land, but that the deed under which he now claims, was fraudulently procured to be executed to himself, instead of to his father. If A purchases property with the money of B, and has it conveyed to himself, a court of equity will raise a resulting trust in favor of B, and will decree the execution of the trust by requiring it to be conveyed to B. I am of opinion, therefore, that Leroy B. Law must be regarded in a court of equity as

holding the legal title in trust for his sisters, as the devisees of their father, and that he should be required to execute the trust. Upon the whole I am for reversing the decree of the circuit court with costs, and entering such decree as said court ought to have entered, in accordance with the principles and conclusions declared in this opinion.

DECREE REVERSED.